O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| FAINA O., | Case No. 2:19-cv-05671-KES |
|---|---|
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| ANDREW M. SAUL, Commissioner of Social Security, | |
| Defendant. | |

## I.

## PROCEDURAL BACKGROUND

Plaintiff Faina O. ("Plaintiff") applied for Titles II and XVI Social Security disability insurance benefits in 2014 while living alone in New Jersey, alleging a disability onset date of April 5, 2011. Administrative Record ("AR") 397-404. On March 21, 2017, the Administrative Law Judge ("ALJ") conducted a hearing in Albany, New York. AR 114-43. At the time, Plaintiff was living alone in Florida and represented by a New Jersey attorney. AR 114, 119. The ALJ sent interrogatories to a physician and scheduled two supplemental hearings. AR 31, 146. The first hearing, held on February 22, 2018, was continued to allow Plaintiff time to find a new representative after she fired her New Jersey lawyer. AR 144-

53, 536.  At the second supplemental hearing on May 24, 2018, neither Plaintiff nor her new lawyer in California appeared.  AR 154-58.

On June 25, 2018, the ALJ issued an unfavorable decision.  AR 31-66.  The ALJ found that Plaintiff last met the insured status requirements in March 2017.  AR 35.  Plaintiff suffered from medically determinable severe impairments of arthritis, degenerative changes in the cervical and lumbar spine with radiculopathy, tendinitis in the left shoulder, visual disturbances, and adjustment disorder.  Id.  Despite these impairments, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [C]laimant can occasionally climb, balance, stoop, kneel, crouch, and crawl; claimant can never drive or be exposed to unprotected heights or hazardous machinery; claimant cannot perform any activities requiring depth perception; claimant has sufficient visual acuity to handle objects and avoid workplace hazards; claimant can understand, remember, and carry out simple and complex instructions; claimant can make judgments on simple work-related matters; claimant can occasionally make judgments on complex work-related matters; claimant can frequently interact with supervisors, coworkers, and the public; and claimant can frequently tolerate changes in the work setting.

AR 39.

Although the ALJ did not obtain testimony from a vocational expert, the ALJ determined that jobs exist in significant numbers that Plaintiff can perform, because her limitations "had little or no effect on the occupational base of unskilled light work."  AR 55.  The ALJ concluded that Plaintiff was not disabled.  AR 56.

## II.

## ISSUES PRESENTED

Issue One A: Whether the ALJ gave specific, legitimate reasons supported by substantial evidence for rejecting the opinions of Plaintiff's treating psychologist in New Jersey, Dr. Royston Cruickshank.

Issue One B: Whether remand is required to allow the ALJ to consider the new opinions of Plaintiff's treating psychiatrist in California, Dr. Charles Lee.

Issue Two: Whether the ALJ gave specific, legitimate reasons supported by substantial evidence for discounting the opinions of orthopedic consultative examiner, Dr. Harlan S. Chiron.

(Dkt. 22, Joint Stipulation ["JS"] at 4, 11.)

## III.

## DISCUSSION

**A. ISSUE ONE A: Dr. Cruickshank.**

On April 12, 2016, Dr. Cruickshank completed a Mental Impairment Questionnaire ("MIQ"). AR 883-88. He opined that Plaintiff was "moderately" limited in doing even "simple" tasks and "markedly" limited in maintaining attention for two hours, sustaining a routine, completing a normal workday, and working at a consistent pace. AR 887. He also opined that Plaintiff would miss work at least three times per month due to psychological symptoms. AR 885. The ALJ gave Dr. Cruickshank's work-preclusive MIQ opinions "little" weight, although the ALJ credited the Global Assessment of Functioning ("GAF") scores assessed by Dr. Cruickshank as consistent with the overall record. AR 52. The ALJ reasoned that the extreme opinions in the MIQ were (1) inconsistent with the other medical opinion evidence, (2) internally inconsistent, and (3) inconsistent with Plaintiff's treatment history, including Dr. Cruickshank's own progress notes. AR 51-52. Plaintiff argues that none of these reasons is supported by substantial evidence. (JS at 5-11.)

### 1. Summary of Relevant Mental Health Evidence.

Plaintiff was born in 1975.  AR 118.  She graduated from college in approximately 2000 with a bachelor's degree in hospitality management and information systems.  AR 121, 429, 993.  After college, she obtained some Oracle professional certifications and worked as an office administrator, network administrator, and data analyst.  AR 123, 416, 429.  In 2007, she began working as a technical analyst for a health insurance company.  AR 122.  In August 2010, her knee gave out and she slipped a disk in her lower back at work while "lifting a heavy, lopsided box" to carry it down a hallway.  AR 117, 546, 552, 554; compare AR 606 (she "slipped and fell" at work).  She was treated for back pain and anxiety.  AR 547-48.  While receiving treatment for her August 2010 injury, she was still working on March 25, 2011.  AR 560.  She claims a disability onset date of April 5, 2011, which is when she was "laid off due to [her] partial disabilities and also because [her] company was not able to provide [her] with further employment."  AR 429.  Plaintiff filed a workers' compensation claim (AR 447) and eventually received a settlement payment (AR 121).

The Joint Stipulation does not discuss Plaintiff's mental health treatment in 2011-2013.  A chronological summary of her treatment starting in mid-2014 puts Dr. Cruickshank's 2016 MIQ in context, as follows:

• June 2014:  Plaintiff travelled to India, possibly to visit her family or check on her income property; she returned to the United States in June 2014.  AR 600, 607, 630; Dkt. 3.  At the time, she denied depression and anxiety, but she had been prescribed Xanax in India.  AR 607.

• July 16, 2014: Per an initial psychological assessment with Dr. Cruickshank, Plaintiff complained of "stress related to work" and "anxiety," although she had stopped working years earlier in 2011.  AR 633.  She had "good" understanding of verbal and written instructions with normal speech and thought content, but "somewhat suspicious" behavior.  Id.  She had intact judgment,

memory, and insight with average intellectual function.  AR 634.  At the time, she was not taking any psychiatric medication or receiving mental health treatment, but she reported having taken Xanax and Prozac in the past.  AR 635.

• August 2014: Plaintiff was prescribed Xanax/alprazolam and Ambien/zolpidem.  AR 640.  Dr. Cruickshank diagnosed Plaintiff as suffering from "adjustment disorder with anxiety" and "anxiety disorder" with a GAF score of 70-75.  AR 642.  Plaintiff was "not interested in therapy" to improve her mental health.  Id.

• August 5, 2014: Dr. A. J. Candela, a neuropsychologist, examined Plaintiff.  AR 649-52.  Plaintiff reported that her mental health was "much better" with her new medication.  AR 650.  She denied panic attacks.  AR 650.  Dr. Candela administered a series of cognitive tests and observed Plaintiff to have at least average intellectual functioning.  AR 650.  He discussed her activities, noting that she could maintain personal hygiene, perform light chores, handle her own money, and enjoy friendships.  AR 651.  He diagnosed Plaintiff with an adjustment disorder and depressed mood, "mild to moderately severe, recurrent."  AR 651.  He opined that she was anxious and depressed over her various physical ailments and infertility.  AR 649-50.  He offered no opinions concerning any work-related functional limitations caused by her mental health.  The ALJ gave Dr. Candela's opinions "significant weight."  AR 50.

• August 13, 2014:  State consultant Mary Ellen Menkin, Ph.D., provided opinions about Plaintiff's mental RFC.  AR 166-71.  She found that Plaintiff could sustain attention, persistence, and pace to complete simple tasks for two-hour time periods over the course of a normal workday or workweek.  AR 170.  Plaintiff could also manage basic, work-related social interactions and respond appropriately to changes.  Id.  Plaintiff was, however, moderately limited in carrying out detailed instructions and sustaining concentration for extended periods.  AR 169.  The ALJ gave Dr. Menkin's opinions "significant weight."  AR

5

51.

• September 2014:  At a follow-up appointment with Dr. Cruickshank, Plaintiff denied any increase in anxiety.  AR 700.  She told Dr. Cruickshank that the doctors treating her physical impairments were prescribing her a muscle relaxant that was inadequate; she wanted hydrocodone, but she could not find a doctor willing to prescribe it.  Id.  She had also stopped going to physical therapy. Id.  Dr. Cruickshank assessed her as having a "neutral" mood with organized thoughts, fair insight, and fair cognitive functioning.  Id.  Plaintiff denied depression, and Dr. Cruickshank saw "no evidence of a psychotic process."  AR 701.

• November 7, 2014: State consultant Brady Dalton, Ph.D. also considered Plaintiff's mental RFC and offered opinions like those of Dr. Menkin.  AR 184-191, 204-11.  Again, the ALJ gave his opinions "significant weight."  AR 51.

• November 20, 2014:  Plaintiff told Dr. Cruickshank that she had "no real complaints except she still has anxiety which is improved …."  AR 836.  He assessed, "Same anxiety, but less than at first" and "improving."  AR 837.  He wrote prescriptions for more medication that she could fill before travelling to India.  Id.

• November-December 2014: Plaintiff spent time in India, including medical treatment to address gynecological issues.  AR 794.

• March 2015:  Plaintiff reported "compliance with meds but [she] still feels stressed and anxious sometimes."  AR 834.  She told Dr. Cruickshank that she was not awarded disability benefits and was still litigating her workers' compensation case; she was "concerned about running out of welfare."  Id.  He assessed that she "remains basically the same," and she was mainly worried about "physical and financial issues."  AR 835.

• June 2015: Plaintiff told Dr. Cruickshank that she had been "away caring for a sick family member."  AR 832.  He rated her condition as "the same – though

1    less preoccupied."  AR 833.

2         • October 13, 2015: At Plaintiff's last appointment with Dr. Cruickshank,

3    she reported "her anxiety levels as about the same."  AR 830.  Dr. Cruickshank

4    noted that she seemed "preoccupied" with her physical ailments and was "still

5    having problems with disability."  AR 830-31.  He assessed her condition as

6    "stable" with "average" intellectual functioning and "fair" insight and judgment.

7    AR 831.

8         • January 2016: Around this time, Plaintiff moved to Florida.  AR 998

9    (record of treatment in Miami on January 6, 2016).

10        • April 12, 2016: Dr. Cruickshank completed the disputed MIQ.  AR 883-

11   88.  As noted above, he opined that Plaintiff was "moderately" limited in doing

12   even simple tasks and "markedly" limited in doing many essential work activities.

13   AR 877.  The form defined a "marked" limitation as "totally precluded on a

14   sustained basis," giving as an example an activity that one might begin but fail at

15   within five minutes.  Id.  He also opined that her psychological symptoms would

16   cause her to miss work at least three times per month.  AR 885.  In the same MIQ,

17   however, he opined that Plaintiff had a GAF score of 65 (AR 883) which indicates

18   only mild symptoms.  See American Psychiatric Association, Diagnostic and

19   Statistical Manual of Mental Disorders, 34 (4th ed.).

20        • June 2, 2016: Dr. Cruickshank discharged Plaintiff from his psychiatry

21   practice, noting that he had last seen her in October 2015, after which Plaintiff

22   "lost contact" with his office.  AR 827, 848.  He opined that her condition had not

23   changed over the course of their treating relationship.  AR 827.  At the time of

24   discharge, her only medication was Cymbalta, an antidepressant.  Id.

25        • April 25, 2017: Almost one year later, Dr. Carlos Danger performed a

26   psychiatric consultative examination.  AR 992-99.  He observed that Plaintiff was

27   calm and cooperative, but her mood was dysphoric and anxious.  AR 993.  She

28   displayed tangential thought, poor concentration, and distractibility.  Id.

Nevertheless, she could live alone and maintain a network of friends.  AR 992.

Plaintiff admitted to marijuana use and had recently been hospitalized (perhaps

referring to her visit to the ER for a sprained ankle on April 23, 2017 [AR 1079-

80]) and given benzodiazepines, which he thought might have accounted for her

decreased concentration.  AR 993-94.  She reported that she was not on any

antidepressants and had not received mental health treatment for more than a year.

AR 993.  He observed that her symptomology was not "too extreme," and he

assessed some "mild" functional limitations but otherwise found that she had no

limits on her ability to understand, carry out, and remember both simple and

complex instructions.  AR 994-96.  The ALJ gave his report "significant" weight.

AR 53.

> • August 26, 2017: Dr. Daryl P. DiDio, Ph.D., responded to interrogatories

from the ALJ about Plaintiff's mental RFC.  AR 1042-49.  He opined that she had

no functional limitations carrying out simple or complex instructions, but she had

mild limitations making judgments about "complex work-related decisions."  AR

1042.  As support, he cited medical records he had reviewed that showed limited

mental health treatment and "essentially normal" mental status examinations over

time.  Id.  He opined that while she could interact appropriately with other people,

she had mild limitations responding to workplace changes and stress due to her

history of anxiety.  AR 1043.  He also noted Plaintiff's "abuse/use" of medical

marijuana and benzodiazepines.  Id.  The ALJ also gave these responses

"significant" weight.  AR 53.

At the 2018 hearing, when asked about her mental impairments, Plaintiff

testified that she could not work due to frequent panic attacks occurring 2-3 times a

week, lasting 3-4 hours, that she linked to her impaired vision.  AR 128, 132.  She

acknowledged that since moving from New Jersey to Florida, she had not obtained

any mental health treatment.  AR 128.  On a typical day, she was able to eat

breakfast, check email, shower, walk her dog, prepare simple meals, and exercise.

AR 134-35; 439.  She could also shop in stores and online, handle her own funds, and make and sell lotions for extra money.  AR 442; Dkt. 3.

Plaintiff testified that her driver's license expired in 2000.  AR 120.  Her car was stolen in 2013.  AR 442.  She reported vision-related problems "reading and driving" in June 2014.  AR 604.  She also reported difficulty driving again in July 2014 due to vision problems, not mental health issues.  AR 621.  In August 2016, she had a California driver's license.  AR 1070-71.  She wrote that she has been "unable to drive or travel at all" since 2016.  AR 542.  She was in a car accident in September 2017, although it was unclear who was driving.  AR 1105.  She could use Uber and Lyft when needed.  AR 120.

### 2.  Relevant Law

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings.  42 U.S.C. § 405(g); see also id. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence."  Id. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  "'Substantial evidence' means more than a mere scintilla," id., but "less than a preponderance."  Desrosiers v. Secretary of Health & Human Services, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted).  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence.  Benitez v. Califano, 573 F.2d 653, 655 (9th Cir. 1978) (quoting Flake v. Gardner, 399 F.2d 532, 540 (9th Cir. 1978)).

In reviewing the record, the Court must consider both the evidence that

9

supports and detracts from the Commissioner's conclusion.  Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  Part of this evidence includes medical opinions from treating, examining, and consulting physicians.  See 20 C.F.R. §§ 404.1527(c), 416.927(c); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Turner v. Comm'r of SSA, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted).  This rule, however, is not absolute.  "Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted).

### 3.  <u>Reason One</u>: Inconsistent with Other Medical Opinions.

Supported, contrary opinions of physicians can supply additional valid reasons for rejecting opinions of treating physicians.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (where the contrary opinions of an examining doctor and a testifying medical expert served as additional, valid reasons for rejecting the opinions of a treating physician).

As demonstrated by the summaries above, Dr. Cuickshank's opinions of Plaintiff's mental RFC as expressed in his April 2016 MIQ are out of line with the opinions of Drs. Danger, Candela, Menkin, Dalton, and DiDio.  Thus, the ALJ's finding that Dr. Cruickshank's MIQ was an outlier opinion is supported by substantial evidence.  While Plaintiff argues that Dr. Cruickshank's opinions are entitled to more weight because he was a treating physician (JS at 5-6), the ALJ may discount medical opinions that are outliers compared to most of the other medical evidence of record.  20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more

1  weight we will give to that opinion.").

2  Plaintiff argues that all the other doctors' opinions are unreliable.  According

3  to Plaintiff, Drs. Menkin and Dalton did not have the benefit of reviewing

4  Plaintiff's later treating records (JS at 10), but their opinions are like those of Dr.

5  DiDio, who did.  Plaintiff notes that Dr. DiDio did not cite all her treating records

6  (JS at 11), but the ALJ was not required to interpret his lack of comprehensive

7  citations as evidence that Dr. DiDio did not review all of Plaintiff's available

8  treating records.  Plaintiff also argues that the opinions of Dr. Cruickshank, who

9  treated Plaintiff between 2014 and 2015, are more reliable than those of Drs.

10  Candela and Danger, because they only saw Plaintiff once.  (JS at 8-9.)  The ALJ

11  was entitled to give more weight to better-supported opinions of examining

12  physicians.  See Tonapetyan, 242 F.3d at 1149.  Furthermore, as explained herein,

13  the ALJ gave additional specific and legitimate reasons for rejected Dr.

14  Cruickshank's MIQ.

15  **4.  Reason Two: Internal Inconsistency.**

16  The ALJ noted that in the same MIQ, Dr. Cruickshank opined that Plaintiff

17  had numerous "moderate" and "marked" limitations, but he still assessed a GAF

18  score of 65, indicating only mild symptoms.  AR 52.  The ALJ thus cited a specific

19  internal inconsistency.[1]  ALJs may discount a treating physician's opinion for

20  being internally inconsistent.  Johnson v. Shalala, 60 F.3d 1428, 1433 (9th Cir.

21  1995) (medical opinion may be rejected because it is self-contradictory).

22  Plaintiff argues that Dr. Cruickshank did not offer inconsistent opinions by

23  first assessing Plaintiff as having a GAF score of 70-75, then later assessing that

24  her GAF score had dropped to 65 despite receiving treatment.  (JS at 13.)  Plaintiff,

25  ───────────────

26  [1] There are several others the ALJ could have cited.  For example, Dr.
    Cruickshank first indicated that Plaintiff's symptoms had caused her to lose at least
27  15 IQ points (AR 833), but he later stated that her condition had not caused
    reduced intellectual functioning and he had not administered an IQ test (AR 885).
28

1  however, fails to address the inconsistency in simultaneously assessing a GAF

2  score of 65 and opining that Plaintiff has numerous moderate and marked

3  limitations.

4          **5.**  <u>**Reason Three:**</u> **Inconsistent with Treatment.**

5        Plaintiff argues that the ALJ failed to identify specific inconsistencies

6  between Dr. Cruickshank's opinion and Plaintiff's mental health treatment record.

7  (JS at 6.)  In fact, the ALJ identified in his opinion specific inconsistencies, several

8  of which are identified below.

9        Plaintiff was taking Xanax for anxiety even while she was still working,

10  although she let her prescription lapse.  AR 547-48, 635.  Shortly after Dr.

11  Cruickshank first saw Plaintiff in 2014, he assessed a GAF score of 70-75

12  (denoting only "slight" impairment) and re-prescribed Xanax.  AR 43, 642; (JS at

13  13).  In late 2014 and early 2015, Plaintiff reported improvement (AR 650) and he

14  opined that she had improved (AR 837) and then stabilized (AR 830, 833, 835).

15  While seeing Dr. Cruickshank, Plaintiff was well enough to live alone, travel to

16  India, and care for a sick family member.  AR 794, 832.  He stopped treating her in

17  October 2015, at which time her condition had not gotten worse.  AR 43, 827, 830.

18  Yet in April 2016, he suddenly opined in the MIQ that Plaintiff had gotten much

19  worse.  He characterized her response to treatment and prognosis as "poor."  AR

20  884-85.  Notably, Dr. Cruickshank never opined that Plaintiff had less than average

21  or fair intellectual functioning (<u>see, e.g.</u>, AR 831, 833, 835, 837, 839), yet in April

22  2016, he opined that she would have "moderate" difficulty understanding even

23  "very short and simple" instructions.  AR 887.  He checked a box indicating that

24  she had "time or place disorientation" (AR 883), but he had always found her alert

25  and oriented during their appointments.  (AR 831 ["a/o x3"], AR 833 [same], AR

26  835 [same], AR 837 [same], AR 839 [same], AR 841 ["fully oriented"].)  The ALJ

27  correctly concluded that Plaintiff's treating history was not consistent with what

28  one would expect for an individual as impaired as Dr. Cruickshank described in his

1   2016 MIQ.

2       Plaintiff argues that her treating history is consistent with numerous marked

3   psychological limitations because (1) on one occasion in 2017, she was treated at

4   the ER with signs of psychosis, and (2) on several occasions, her medical records

5   reflect that she treated medical staff members angrily when they would not provide

6   her with narcotics.  (JS at 11.)  The medical records cited by Plaintiff in support of

7   this argument are summarized as follows:

8       • August 2014: Plaintiff had eye surgery on August 13, 2014.  During a

9   follow-up call, she "calmly state[d] that she is [in] excruciating pain."  AR 977.  At

10  a follow-up appointment on August 19, medical staff assessed, "See no reason for

11  pain. … Pt wants Demerol, but explained that there is no suggestion of any

12  process in the eye that would warrant a narcotic."  AR 978.  Another staff member

13  noted, "Patient is very argumentative and states in sever[e] pain, although does not

14  appear to be in pain."  AR 981.  The note continued, "Concerned because the

15  amount of pain that patient expresses is way beyond what would guess from

16  clinical appearance.  Plaintiff had called the surgery center and demanded an Rx

17  for Vicodin.  Explained that pain should not be that sever[e] …."  AR 982.

18      • August 2016: Plaintiff went to the ER at Bellevue Hospital in New York

19  complaining of psychiatric issues.  AR 1053.  She complained of depression and

20  requested a refill of her medications.  AR 1056.  She was "calm and cooperative"

21  during the intake interview.  Id.  She was neither irritable nor threatening and

22  scored "zero" on a violence screening checklist.  AR 1058.  Plaintiff told the ER

23  staff that she had previously been hospitalized for psychiatric issues "many times"

24  in San Francisco.  Id.  She also told staff that she had travelled to India on July 1,

25  where she did not need antidepressants (although she drank vodka daily before

26  "detox"), but upon returning to New York on August 5 and riding the subway,

27  which she found stressful, she wanted to refill her medications.  AR 1058, 1060,

28  1063.  She had already been to the Spine and Pain Institute to request medication,

but they would not give her the medications that she wanted, so she came to the ER. AR 1061. A staff member asked why she had come to Bellevue after going to NYU Tisch the day before seeking medication; Plaintiff denied this had occurred, even though the staff member could see notes from that visit. Id. Plaintiff told staff, "I know what works for me, benzodiazipines [sic]." Id. When asked about her symptoms, she refused to describe them, insisting that she knew what she needed and ending the interview; later however, staff saw her interacting pleasantly with others. AR 1062. The NYU Tisch records noted that Plaintiff had "frequently" asked for benzodiazepines and become "irritable" when none were provided. Id. They could not find records of Plaintiff having any mental health prescriptions filled since mid-2016. AR 1063.

Ultimately, the Bellevue staff assessed Plaintiff as engaging in drug-seeking behavior.[2] They described her as "hostile and irritable but able to maintain behavioral control." AR 1066. While she was "pleasant and appropriate" with staff members who were not denying her requests, she was eventually escorted from the ER by the hospital police. Id. Even so, she was assessed as "psychiatrically stable" and "calm and in control of her behavior at this time." AR 1074. The ER notes concluded, "diagnosis is unspecified anxiety disorder, though there is also likely large component of secondary gain to this presentation as she requests benzodiazepines and is unwilling to accept other medications …." AR

---

[2] Plaintiff "was disturbing other patients who were trying to sleep . . . when she was yelling for klonopin." AR 1071. "Aftercare planning was somewhat thwarted by patient demanding pain medication, most specifically tramadol. . . . Patient then began to ask for multiple medications and seemed set on getting them before leaving the emergency room, and was not attentive to writer's suggestions about establishing pain management care and mental health care in either NYC or NJ. Finally, patient . . . was refusing to sign discharge papers or engage in further discussion unless she saw the doctor for pain meds." AR 1071-72.

1066-67.[3]

• April 2017: Plaintiff visited the Palmetto General Hospital in Florida complaining of a panic attack and sprained ankle. AR 1079-80. Plaintiff reported that she had recently moved from California, needed medication refills, and at "worst," had moderate symptoms of depression and anxiety. AR 1080. She denied back and neck pain, and she displayed a normal gait. AR 1081. She presented with an "anxious, aggressive, angry" mood but no intent to harm herself or others. AR 1082. She was prescribed Xanax and pain medication and discharged in "stable" condition. AR 1084.

• June 2017: Plaintiff went to the Mt. Sinai ER in Florida at about 9:30 p.m. where she was diagnosed with "acute psychosis" and "homicidal ideations." AR 1013. She complained of eye pain after something flew into her eye while she was riding the bus. AR 1014. While receiving treatment, she told staff that she wanted to return to India to get better medical care, and she had "predicted 9/11 many years ago." AR 1014, 1018. She was assessed as "delusional." Id. Staff, however, also assessed her as "negative for behavioral problems." AR 1015. She presented with an anxious mood, rapid speech, and tangential thought. AR 1016. She expressed fanciful homicidal ideations, saying that if she could not go back to India, then she would kill someone, because she was angry about riding the bus. AR 1018. She was discharged to "home/self care" the next morning. AR 1013.

• January 2018: In this one-page record about eye treatment, Dr. Sanjay Smith noted that Plaintiff "refused dilution and is very combative." AR 1104. In February 2017, in contrast, he assessed her "mood/affect" as "normal." AR 961.

• March 2018: Plaintiff visited the North Shore Medical Center ER in Florida. AR 1124. She complained of difficulty breathing after a fall while riding her bike. Id. She told the ER staff that she had been "depressed and suicidal for a

---

[3] Much earlier records also document Plaintiff's drug-seeking behavior. See AR 772, 780.

few months."  Id.  Plaintiff submitted only page 1 of 14 of these ER records, so there is no evidence of what treatment she received or her discharge.  In the JS, Plaintiff cites to no other records indicating she ever had suicidal ideations.

Plaintiff argues that the records that reflect her arguing with medical staff over her treatment show that she has disabling mental illness, because she displayed "conduct issues which would not reasonably be accepted in a workplace."  (JS at 29.)  The ALJ, however, reasonably understood these episodes as stemming from Plaintiff's drug-seeking behavior and frustration with physicians who would not provide drugs on demand rather than symptoms of Plaintiff's anxiety or depression.  AR 41.

Regarding Plaintiff's June 2017 episode of acute psychosis, it is aberrational in the AR.  Plaintiff stopped receiving mental health treatment from Dr. Cruickshank in October 2015 and points to no records of subsequent treatment between that date and the June 2017 episode, suggesting that it arose after a prolonged lack of compliance with recommended medication.  Indeed, with treatment under Dr. Cruickshank, including prescription antidepressants, Plaintiff's condition improved and stabilized.  AR 830, 833, 835, 837.  In contrast, in April 2017, Plaintiff reported that she was not taking any antidepressants.  AR 993.  For all these reasons, the ALJ could reasonably interpret Plaintiff's one acute episode as not reflecting a generalized worsening of her mental health symptoms.  As such, the episode does not undercut the ALJ's reasoning that the opinions in Dr. Cruickshank's 2016 MIQ were generally inconsistent with Plaintiff's treating history.

**B.  ISSUE ONE B: Dr. Lee.**

**1.  Relevant Administrative Proceedings.**

After the ALJ's adverse decision, Plaintiff requested review by the Appeals Council.  AR 393.  She also submitted several proposed new exhibits, including a Mental RFC Assessment ("RFCA") by Dr. Charles Lee dated August 8, 2018.  AR

72-74.  The RFCA explains that Dr. Lee first saw Plaintiff on June 6, 2018, and he had two follow-up appointments with her on July 13 and July 26, 2018.  AR 73. Per page 1 of 2 the treating record from July 26, Dr. Lee prescribed Plaintiff medication to reduce anxiety.  AR 101.  Plaintiff did not submit any other records from her appointments with Dr. Lee.

Dr. Lee opined that Plaintiff was not significantly limited in her ability to carry out simple instructions, but she was moderately limited in understanding and carrying out detailed or complex instructions and in remembering work-like procedures and locations.  AR 72.  She was markedly limited in her ability to maintain concentration, adhere to a schedule, sustain a routine, and work in coordination with others.  Id.  He also opined that she was markedly limited in her ability to complete a typical workday, get along with others, accept instruction, and make plans independently.  AR 73.  He observed that she has "extremely high levels of anxiety" that interfere with her ability to concentrate and get along with others.  Id.  He described her thought process as "circumstantial" and "loose," but not "delusional."  AR 74.  He concluded that she had an "unspecified anxiety disorder" and noted, "Please keep in mind that I have had a limited amount of time to meet with her and that these diagnoses may be revised as I obtain more history." Id.

The Appeals Counsel considered Dr. Lee's RFCA and determined that it did not relate to the time period before the ALJ's decision.  AR 2.  It declined to make Dr. Lee's RFCA part of the record.  AR 5 (listing new exhibits added by the Appeals Council).

## 2.  Rules Governing Remand to Consider New Evidence.

District courts encounter several different scenarios when claimants submit new evidence following the ALJ's decision.  In one scenario, the claimant submits the evidence to the Appeals Council, and the Appeals Council makes the evidence part of the administrative record.  District courts must consider that new evidence

17

in reviewing the Commissioner's decision for substantial evidence under sentence four of 42 U.S.C. § 405(g).  See Brewes v. Comm'r of SSA, 682 F.3d 1157, 1163 (9th Cir. 2012); 42 U.S.C. § 405(g) (providing that a court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing").

In another scenario, the claimant submits the evidence for the first time to the federal district court.  District courts have jurisdiction to remand under sentence six of 42 U.S.C. § 405(g), but only if the new evidence is "material" and there was "good cause for the failure to incorporate such evidence into the record." See Wood v. Burwell, 837 F.3d 969, 977-78 (9th Cir. 2016); 42 U.S.C. § 405(g) (providing that the "court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material  and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.").

In a third scenario, the claimant submits the evidence to the Appeals Council, but the Appeals Council declines to include it as part of the administrative record.[4]  The evidence becomes part of the administrative record before the federal

---

[4] The Court has found two other scenarios.  In one scenario, evidence is submitted to the Appeals Council but is neither considered nor looked at—e.g., the evidence was lost.  The Ninth Circuit in Taylor v. Comm'r of SSA, 659 F.3d 1228, 1233 (9th Cir. 2011), faced this scenario and in remanding cited only the regulations governing Appeals Council review.  Given that, as explained herein, the Ninth Circuit did not have jurisdiction to review the Appeals Council's discretionary decision, it is possible that Taylor relied neither on sentence four nor sentence six but rather on the claimant's procedural due process rights.  See, e.g., Klemm v. Astrue, 543 F.3d 1139, 1144 (9th Cir. 2008) (discussing exception to general rule that district courts do not review discretionary decisions of Appeals Council and understanding that exception to apply to any colorable constitutional claim of due process violation that implicates a due process right to a meaningful opportunity to be heard).

district court but is not part of the administrative record that the Appeals Council "considers" in declining review.  That is the scenario this case presents.

The Appeals Council decision not to exhibit new evidence is a discretionary decision that this Court has no jurisdiction to review.  In Califano v. Sanders, 430 U.S. 99, 107-09 (1977), the Supreme Court held that the Appeals Council's refusal to reopen a claim years after the initial denial was discretionary and not subject to judicial review.  The Ninth Circuit later cited Sanders in deciding that it had no jurisdiction to review an Appeals Council denial of a request to extend the filing period.  See Peterson v. Califano, 631 F.2d 628, 630 (9th Cir. 1980) (holding that Appeals Council's denial of request to extend filing period, after attorney claimed that letter from Appeals Council regarding the deadline had never been received or was misfiled, was not reviewable, because a "final decision . . . plainly refers to a decision on the merits").  The Appeals Council's decision not to exhibit new evidence is not a "decision on the merits" and under Peterson is not reviewable by this Court.  See Sanders, 430 U.S. at 108 ("[Section 405(g)] clearly limits judicial review to a particular type of agency action, a 'final decision of the Secretary made after a hearing.'  But a petition to reopen a prior final decision may be denied without a hearing . . . .  Indeed, the opportunity to reopen final decisions and any hearing convened to determine the propriety of such action are afforded by the Secretary's regulations and not by the Social Security Act."); see also Reynolds v. Colvin, No. CV 12-9179-JPR, 2013 WL 4789833, at *7 (C.D. Cal. Sept. 6, 2013) ("But the proper remedy for any unfairness caused by a claimant's late submission of allegedly inapplicable evidence is for the Appeals Council to refuse to consider

---

In the other scenario, the evidence is submitted to the Appeals Council and it is unclear whether it was rejected or considered.  See, e.g., Vahey v. Saul, No. CV 18-00350-ACK-KJM, 2019 WL 3763436, at *9-10 (D. Haw. Aug. 9, 2019).  Those courts have generally relied on sentence four of § 405(g) to remand for further administrative proceedings.  See id.

1    it, which it has the discretion to do . . . .'").

2        Furthermore, since the new evidence was not included as part of the

3    administrative record, the Court cannot review that evidence under sentence four.

4    See Bales v. Berryhill, 688 F. App'x 495, 496 (9th Cir. 2017) ("Bales contends

5    that two medical reports she submitted to the Appeals Council are part of the

6    administrative record before this court.  We disagree.  Because the Appeals

7    Council did not consider Bales's new medical records, this evidence did not

8    become part of the administrative record. . . . Bales has not met her burden of

9    demonstrating materiality and good cause for remand under 42 U.S.C. § 405(g).");

10   Neuhauser v. Colvin, No. C14-5421 BHS, 2015 WL 5081132, at *3 (W.D. Wash.

11   Aug. 27, 2015) (citing various cases applying sentence six review in similar

12   circumstances).  Thus, following Bales,[5] the Court reviews the new evidence under

13   sentence six of § 405(g) for materiality and good cause.[6]

14       The Ninth Circuit has interpreted sentence six "materiality" this way: "The

15   new evidence must bear 'directly and substantially on the matter in dispute.'  Ward

16   v. Schweiker, 686 F.2d 762, 764 (9th Cir. 1982).  [Claimants] must additionally

17

18       [5] Other district courts disagree with this Court's approach and conclude that
19   the "transcript of record" includes evidence that the Appeals Council did not
     exhibit.  These cases do not cite Bales.  See, e.g., West v. Berryhill, No. 18-CV-
20   00092-DKW-RT, 2019 WL 362259, at *6 n.7 (D. Haw. Jan. 29, 2019) (holding
     that non-exhibited evidence was nonetheless a "part of the certified transcript of
21   record" in the case before the district court).

22       [6] Several opinions state in dicta that sentence six review applies "only" to
23   evidence presented for the first time to the district court.  See, e.g., Flores v.
     Shalala, 49 F.3d 562, 569 (9th Cir. 1995).  These cases did not confront the
24   situation here, where evidence was presented to the Appeals Council but never
25   "considered."  These opinions can be reconciled with Bales by viewing the new
     evidence as in effect having been presented for the first time for consideration to
26   the district court.  Presumably, district courts would make their own determinations
27   of whether there was "good cause" for failing to present the evidence before the
     Appeals Council stage.

28

1   demonstrate that there is a 'reasonable possibility' that the new evidence would

2   have changed the outcome of the administrative hearing."  Mayes v. Massanari,

3   276 F.3d 453, 462 (9th Cir. 2001).  In order for the new evidence to bear directly

4   and substantially on the matter in dispute, it must relate to the relevant time period.

5   See Bruton v. Massanari, 268 F.3d at 827 (later determination based on "different

6   medical evidence" for a "different time period" was not "material" for purposes of

7   sentence six remand); Ward v. Schweiker, 686 F.2d 762, 765 (9th Cir. 1982)

8   (evidence dated two years after claimant was found able to work, while possibly

9   probative of the nature of the disease or disability, was not material to the

10  termination of benefits because the evidence appeared to indicate, at most, a more

11  recent deterioration of condition).

12       **3.  Analysis.**

13       Plaintiff argues that Dr. Lee's RFCA relates to the relevant time period

14  because, while it was dated two months after the ALJ's decision, Dr. Lee began

15  treating Plaintiff about two weeks before the ALJ's decision and describes

16  psychiatric symptoms that pre-existed the ALJ's decision.  (JS at 12.)

17       The date of a medical opinion is not dispositive of whether it relates to the

18  relevant time period.  Nothing in Dr. Lee's RFCA suggests that it is retrospective.

19  To the contrary, it says that Dr. Lee had never seen Plaintiff before June 6, 2018,

20  and even by August 2018, his opinions were only tentative because he did not

21  know her medical history.  AR 74.  It is unclear if his descriptions in August 2018

22  of her mannerisms would apply equally to each of his three appointments with

23  Plaintiff, because she failed to submit the complete treating records.  Plaintiff,

24  therefore, has failed to demonstrate that Dr. Lee's opinion bears directly and

25  substantially on the matter in dispute.

26  **C. ISSUE THREE: Dr. Chiron.**

27       On January 18, 2017, Dr. Harlan S. Chiron conducted an orthopedic

28  examination of Plaintiff.  AR 930-41.  He observed that she had a decreased range

of spinal motion, but with "suboptimal effort."  AR 931.  He noted that while

Plaintiff complained of dizziness and reported that she could not stand for more

than an hour, she displayed a normal gait.  AR 931-32.  He opined that she could

do "sedentary" work.  AR 932.  Specifically, he opined that she could

"occasionally" lift or carry up to 10 pounds, but never more.  AR 936.  She could

sit, stand, or walk 4 hours each in an 8-hour workday, doing each activity for up to

1 hour at one time.  AR 937.  He also opined that Plaintiff could "occasionally"

kneel or crouch but "never" stoop or crawl.  AR 939.

ALJ gave "some weight" to Dr. Chiron's opinion but did not adopt all the

limitations he proposed.  The ALJ found that Plaintiff could "occasionally" stoop

or crawl, rather than never.  AR 39.  The ALJ also found that Plaintiff could do

"light" work, which generally requires lifting up to 10 pounds frequently and 20

pounds occasionally and walking or standing up to 6 hours each workday.  20

C.F.R. §§ 404.1567(b), 416.967(b); Social Security Rulings ("SSR") 83-10, 1983

WL 31251.  Comparatively, sedentary work involves lifting no more than 10

pounds at a time and sitting most of the workday.  20 C.F.R. §§ 404.1567(a),

416.967(a); SSR 83-10.  In reaching this RFC determination, the ALJ gave

"significant" weight to the opinions of the state agency consultants Drs. Simpkins

and McLarnon, both of whom opined that Plaintiff could do light work with

occasional postural activities.  AR 50-51, citing AR 166-69 and 185-89.  The ALJ

reasoned as follows:

> I grant some weight to the opinions of Dr. Chiron because his clinical
>
> observations support his findings and because his findings are
>
> somewhat consistent with the medical evidence of record.  However,
>
> I ultimately conclude that claimant is capable of performing a range
>
> of light work based on the opinions of the [Disability Determination
>
> Services, or "DDS"] consultants and the lack of objective medical
>
> evidence, such as clinical findings and diagnostic testing, supporting

1    the physical limitations that claimant has alleged.

2    AR 53.

3        Plaintiff argues that the ALJ failed to give legitimate reasons for discounting

4    the opinions of Dr. Chiron, because (1) as an examining physician, his opinions are

5    presumptively entitled to more weight than those of Drs. Simpkins and McLarnon,

6    and (2) the lack of supporting objective medical evidence may be a reason to

7    disbelieve Plaintiff's subjective symptom testimony, but it is not a reason to

8    discount medical opinion evidence. (JS at 32.)

9        Substantial evidence supports the ALJ's conclusion that Plaintiff's treating

10   history does not contain objective medical evidence (such as x-rays or MRIs) that

11   Plaintiff is capable of no more than sedentary work. Plaintiff's orthopedic

12   problems began with her back injury in 2010 while she was still working. EMG

13   testing at that time was "unremarkable" and did not support a finding of lumbar

14   radiculopathy. AR 576-77. The JS does not discuss any treatment Plaintiff

15   received for back pain from 2011-2014. In May 2014, a physician treating

16   Plaintiff in connection with her workers' compensation claim ordered spinal x-rays

17   and an MRI. Those tests revealed only mild issues. AR 581-86 ("minimal

18   degenerative" change at L3-L4); AR 594 ("no significant" disc herniation or

19   foraminal narrowing). In August 2014, Plaintiff rated her pain as 2/10 and

20   displayed a normal gait with a full range of motion. AR 754. In September 2014,

21   she engaged in yoga and running for exercise. AR 791. Throughout her 2014 and

22   2015 appointments with Dr. Cruickshank, she rated her pain as none or mild. AR

23   830, 832, 836, 841. After treating her for two years, Dr. Cruickshank wrote that he

24   was not "aware of physical illness except self-report of back pain and sight

25   limitations." AR 886. In 2016, Plaintiff had a normal EEG test and still displayed

26   a normal gait. AR 877, 900. Doctors encouraged her to exercise to feel better.

27   AR 882. In 2017, x-rays of Plaintiff's left shoulder showed no abnormalities. AR

28   1102-03. In January 2018, Plaintiff had normal EMG test results. AR 1132-33.

Indeed, in March of 2018, Plaintiff could ride a bicycle, demonstrating exertional abilities that the ALJ specifically identified as inconsistent with her claimed physical limitations.  AR 49, 1124.  This is particularly relevant to Dr. Chiron, since he observed that Plaintiff gave "suboptimal" effort on the objective tests he administered.  AR 931.

As noted above, Plaintiff argues that the ALJ improperly conflated his analysis of Dr. Chiron's opinion with his analysis of Plaintiff's symptom testimony.  (JS at 32.)  Plaintiff does not challenge the ALJ's treatment of her testimony, however.[7]  She has therefore waived this issue.  See Gertsch v. Colvin, 589 Fed. App'x 381, 381 (9th Cir. 2015) ("The ALJ rejected [claimant's] subjective complaints as not credible, a finding that [claimant] does not challenge on appeal and has therefore waived . . . .  Accordingly, the ALJ did not err in giving limited weight to the opinions of Drs. Moullet and Gray, to the extent that those opinions rested on [claimant's] discredited subjective complaints.").

The lack of supporting objective evidence is a legitimate reason to give less weight to a medical opinion.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (stating that an ALJ may reject a treating physician's opinion where it relies largely on a claimant's discredited self-reports, rather than on objective clinical evidence).  By citing the lack of supporting objective medical evidence and inconsistency with the opinions of the DDS consultants, the ALJ gave specific,

---

[7] Indeed, Plaintiff's testimony was extreme.  She claimed that she could not rotate her neck at all.  AR 126, 138.  She could not tolerate traveling (AR 127-28), despite her apparent travel at around the time of the hearing between New Jersey, Florida, and California.  She could not climb a flight of stairs without sitting down.  AR 129.  She could not see beyond two feet.  Id.  She could "barely" sit for an hour at a time.  AR 135.  She did not have the "muscle strength" to write.  Id.  If she used a stapler, she believed that she would "end up stapling [her] finger."  AR 136.  She could not do sedentary or part-time jobs, because they "don't exist" and "are not, you know, high-paying jobs."  AR 138.  She did not believe that she was capable of stuffing an envelope; she "wouldn't even know how to."  AR 139.

1   legitimate reasons supported by substantial evidence for giving only "some"

2   weight to Dr. Chiron's opinions.

3                                         **IV.**

4                                  **CONCLUSION**

5           For the reasons stated above, IT IS ORDERED that judgment shall be

6   entered AFFIRMING the decision of the Commissioner.

7

8   DATED:  June 15, 2020                    _____

9                                            KAREN E. SCOTT

10                                           United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28